# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Melvin Vaughn, | Case No. 18-CV-1266 (JRT/HB) |
| Petitioner, | |
| v. | **REPORT AND RECOMMENDATION** |
| Warden R. Marques, | |
| Respondent. | |

This matter comes before the Court on Petitioner Melvin Vaughn's Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241, "Petition" [Doc. No. 1], accompanied by a Memorandum of Law in Support of Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241, "Memorandum" [Doc. No. 2]. Respondent Warden R. Marques has responded to the Petition, and Vaughn elected not to file a reply. *See* (Gov't's Resp. to Pet. for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241, "Resp." [Doc. No. 5]; Decl. of Dr. Emily Becker, "Becker Decl." [Doc. No. 6]); *cf.* (May 22, 2018 Order [Doc. No. 4 at 2] (permitting but not requiring reply).) For the reasons provided below, the Court recommends denying the Petition and dismissing this action with prejudice.

## I.   BACKGROUND

In June 2011, Vaughn entered into a plea agreement under which he agreed to plead guilty to conspiring to distribute at least 280 grams of material containing cocaine base. *See* Plea Agreement at 1, *United States v. Vaughn*, No. 11-CR-3009 (D. Neb. June 28, 2011). In September 2011, the U.S. District Court for the District of Nebraska

sentenced Vaughn to 180 months in prison, followed by 5 years of supervised release. *See* J. in a Criminal Case at 2–3, *United States v. Vaughn*, No. 11-CR-3009 (D. Neb. Sept. 23, 2011). Relying on certain retroactive amendments to the U.S. Sentencing Guidelines, the sentencing court later reduced Vaughn's prison term to 130 months. *See* Order Regarding Mot. for Sentence Reduction Pursuant to 18 U.S.C. § 3582(c)(2) at 1, *United States v. Vaughn*, No. 11-CR-3009 (D. Neb. Apr. 15, 2016).

In April 2016, Vaughn was an inmate at the Federal Prison Camp in Yankton, South Dakota ("FPC-Yankton") participating in FPC-Yankton's Residential Drug Abuse Program ("RDAP"). *See* (Mem. at 1; Resp. at 1.) Developed by the U.S. Bureau of Prisons ("BOP") due to a Congressional requirement that the BOP "provide residential substance abuse treatment" to inmates, RDAP is a three-phase program that offers successful participants the chance to reduce their time in custody by up to a year. *See* (Resp. at 2–3); *cf.* 18 U.S.C. § 3621(e)(1) (establishing treatment-provision requirement); *id.* § 3621(e)(2)(B) (establishing possible sentence reduction); 28 C.F.R. § 550.53 (discussing RDAP phases). By early April 2016, Vaughn had completed RDAP's first phase, "a unit-based residential component . . . comprised of a course of individual and group activities provided by drug abuse specialists in a treatment unit set apart from the general prison population." (Resp. at 3, 6; Mem. at 1.)

On April 30, 2016, FPC-Yankton staff issued Vaughn an incident report based on conduct observed in the visiting room (the area where inmates meet with outside visitors). (Resp. at 5; *see also* Becker Decl. Ex. C [Doc. No. 6-3 at 3–4] (incident

2

report).[1])  The report asserted that Vaughn had acted inappropriately with a female visitor:

> At approximately 12:45pm, . . . [an FPC-Yankton staff member] saw [Vaughn] reach his hand inside the front of his visitor's . . . pants. . . .  Vaughn's visitor attempted to conceal Vaughn's hand by moving her coat over his hand.  [The staff member] immediately approached . . . Vaughn and his visitor. . . .  Vaughn attempted to quickly remove his hand from the front of his visitor's pants.  [The staff member] instructed . . . Vaughn to exit the visiting room immediately.  [The staff member] explained to Vaughn what [he had] witnessed and [Vaughn] admitted he had his hands inside of her pants.

(*Id.* at 3.).  Vaughn admitted to another officer that during this interaction, he had put a finger into his visitor's vagina.  *See* (*id.* at 8 (memorandum from J. Tadlock to J. Pribyl).)

The incident report initially listed Vaughn's violation as "engaging in a sexual act," corresponding to a "prohibited act code" of 205.  (*Id.* at 3); *see also* 28 C.F.R. § 541.3(b) (containing table of prohibited acts and associated codes).  BOP regulations detail four categories of prohibited acts—the most serious are "100-level" acts, and the least serious are "400-level" acts.  *See* 28 C.F.R. § 541.3.  A code-205 violation thus falls within the second-most-serious category of prohibited acts.  *See id.*

Authorities investigated the incident report soon after the alleged incident.  *Compare* (Becker Decl. Ex. C. at 3 (stating that incident occurred at 12:45 PM), *with id.* at 4 (stating that investigation began at 1:45 PM).)  The investigator reported asking Vaughn if he had placed "his hand down the pants of his visitor"; Vaughn confirmed that

---

[1] When referencing the exhibits, CM/ECF pagination is used.

3

he had. (*Id.* at 4.) In the report's "Investigator's Comments and Conclusions" section, the investigator stated that "there is enough supporting evidence to continue to processing [sic] this report through the inmate disciplinary process," and that "[t]he reporting officials [sic] report is accurately written and the charge of prohibited act code 205 is warranted." (*Id.*)

As the Court understands the applicable regulations, *cf.* (Resp. at 4–5 (providing some description)), after an incident-report investigation, a Unit Disciplinary Committee ("UDC") reviews the report; inmates may appear at this review. *See* 28 C.F.R. § 541.7(a), (d). A UDC has the discretion to refer an incident report to a Discipline Hearing Officer ("DHO") to conduct a hearing on the report. *See id.* §§ 541.7(g), 541.8. Inmates are also generally permitted to attend these DHO-led hearings. *See id.* § 541.8(e).

It is not entirely clear from the report what happened during the disciplinary proceedings concerning Vaughn's incident report. The report's section on "Committee Action" contains various materials that are crossed out, and at least two different people appear to have made entries on the form on two different dates. *See* (Becker Decl. Ex. C. at 3–4).) Based on the relevant C.F.R. provisions and materials provided by Respondent, however, it appears that (1) the UDC review occurred on May 2, 2016; (2) Vaughn admitted the relevant conduct at that review; (3) the UDC referred the incident report to a DHO; (4) the DHO-led hearing took place on May 4, 2016; and (5) Vaughn accepted responsibility for the relevant conduct at the DHO hearing.

4

The Court may be wrong about these particulars,[2] but on two key points there appears to be no dispute. First, Vaughn admitted to the relevant conduct at least twice during the hearing process (in addition to his admission during the earlier investigative process). Second, at some point during the disciplinary process,[3] someone decided to reclassify the act code of Vaughn's violation; instead of the 200-level act of "engaging in a sexual act," he was charged with the 400-level act of "conduct with a visitor in violation of BOP regulations."

On May 5, 2016, Vaughn was expelled from FPC-Yankton's RDAP program. *See, e.g.*, (Resp. at 6.) The expulsion was explicitly due to the visiting-room incident. *See* (*id.*; *see also* Mem. at 2.) Under 28 C.F.R. § 550.53(g)(1), an inmate "may be

---

[2] The main source of the Court's confusion is Respondent's statement that the UDC hearing took place on May 4, 2016. *See* (Resp. at 6.) The relevant regulations suggest that a two-phase system exists in which a DHO-led hearing may follow a UDC-led review, and notations on the incident report suggest that two separate phases of a report-related process occurred on May 2, 2016, and May 4, 2016. *See* (Becker Decl. Ex. C. at 3.) Furthermore, the notations suggest a referral to a DHO. The Court thus believes that Respondent has made an error here regarding the relevant timeline. Even if the Court is wrong, however, this error should not affect this paragraph's factual conclusions or how those conclusions affect the resulting analysis.

[3] Respondent contends that the DHO "inadvertently referred the case to the UDC as a Code 407 . . . even though Vaughn's actions met the Code 205 elements," but that "a decision was made to not amend the code back to the higher charge." (Resp. at 5.) Given the relevant regulations' discussion of the prison-disciplinary process as one where a UDC may make referrals to the DHO—and the incident report's statement that the report would be "refer[red] to the DHO"—the Court is unsure how to understand Respondent's statement. For example, is Respondent suggesting that what really happened is that the UDC, following the May 2 review, mistakenly and unintentionally used "Code 407" when it referred the incident report to the DHO? Or that it meant to use "Code 407" in the referral but that in Respondent's view, that classification was a mistake.) In any event, the key point is that the incident report's resolution led to Vaughn being found to have committed a 400-level act rather than a 200-level act.

removed from [RDAP] . . . because of disruptive behavior related to the program or unsatisfactory progress in treatment." *Cf.* (Becker Decl. ¶ 6 (making the same point).) And while "[o]rdinarily, inmates must be given at least one formal warning before removal from RDAP," the relevant regulations state that "[a] formal warning is not necessary when the documented lack of compliance with program standards is of such magnitude that an inmate's continued presence would create an immediate and ongoing problem for staff and other inmates." 28 C.F.R. § 550.53(g)(2); *cf.* (Becker Decl. ¶ 6 (making the same point).) Vaughn took various actions to appeal his expulsion, but none led to the expulsion's reversal. *See* (Mem. at 2.)

The Clerk of Court received and filed the present Petition in May 2018. *See* (Pet. at 1.) Vaughn asks the Court to "restore [his] status as 'RDAP Complete' and [his] eligibility for a sentence reduction under [18 U.S.C. § 3621(e)]." (*Id.* at 9.[4]) He asserts two grounds for relief. Ground One states that Vaughn's "Constitutional Rights to Equal Protection under the Law were violated when he was expelled from the BOP's [RDAP] for receiving a 400 level disciplinary infraction and other 'similarly situated' inmates guilty of higher level infractions were treated favorably." (*Id.* at 7.) Ground Two states that "BOP Officials had discriminatory purpose and discriminatory intent when they expelled Petitioner from RDAP for a 400 level infraction but did not expel 'similarly

---

[4] Vaughn had not completed RDAP when the April 2016 incident occurred; he had only completed the program's first phase. *See* (Resp. at 6; *cf.* Mem. at 1 (noting "successful [completion of] the residential portion of the program" in April 2016).) It is thus unclear why proper relief here would be to treat Vaughn as "RDAP Complete." But because the Court recommends denying the Petition, it need not address what relief would be proper were the Petition granted.

6

situated' inmates who were not African American." (*Id.* at 8.) The Court construes these two grounds as essentially making the same argument: that the BOP's decision to expel Vaughn from RDAP violated his Fourteenth Amendment right to equal protection.

## II. ANALYSIS

### A. Jurisdiction

Before turning to the merits of Vaughn's argument, the Court must address two jurisdictional issues. First, the Court *sua sponte* considers whether Vaughn's transfer to a Pennsylvania facility stripped this Court of jurisdiction over the Petition. The Court concludes that the transfer did not have that effect. Second, the Court addresses Respondent's claim that the Court lacks jurisdiction to review RDAP-expulsion decisions. The Court disagrees: this Court has jurisdiction over constitutional challenges to such decisions, and Vaughn's challenge is a constitutional one.

#### 1. Effects of Transfer

Vaughn filed the Petition while in custody at the Federal Correctional Institution at Sandstone, Minnesota. *See* (Pet. at 2.) This was appropriate, as a § 2241 petition challenging a sentence's execution should be filed in the petitioner's district of confinement. *See, e.g.*, *Khdeer v. Paul*, No. 18-CV-2112 (ECT/BRT), 2018 WL 6919637, at *3 n.3 (D. Minn. Nov. 29, 2018) (Thorson, Mag. J.) (citing *Nichols v. Symmes*, 553 F.3d 647, 649 (8th Cir. 2009)), *report and recommendation adopted*, 2019 WL 79318 (Jan. 2, 2019) (Tostrud, J.). But after the Petition was fully briefed, Vaughn was transferred to the Federal Prison Camp in Bradford, Pennsylvania. *See* (August 13, 2018, Letter from Melvin Vaughn to the Court [Doc, No. 8].)

The bulk of case law on this issue indicates that notwithstanding Vaughn's move, this Court still has jurisdiction over the Petition. *See, e.g.*, *Weeks v. Wyrick*, 638 F.2d 690, 692 (8th Cir. 1981) ("Once the custodian is properly served, subsequent transfer of the petitioner does not cause a loss of habeas corpus jurisdiction in the original district.") (citing cases); *Eubanks v. Wilson*, No. 15-CV-2677 (PJS/DTS), 2017 WL 2303506, at *2–5 (D. Minn. May 1, 2017) (Schultz, Mag. J.) (citing cases); *Foster v. Krueger*, No. 12-CV-0269 (SRN/JJG), 2013 WL 3338720, at *1 n.1 (D. Minn. July 2, 2013) (Graham, Mag. J. as adopted by Nelson, J.) (same).

The Court acknowledges a relatively recent decision from this district challenging this view. *See Redding v. Thompson*, No. 17-CV-2470 (JRT/TNL), 2018 WL 850147, at *3–6 (D. Minn. Jan. 23, 2018) (Leung, Mag. J.), *report and recommendation adopted*, 2018 WL 847764 (Feb. 13, 2018) (Tunheim, C.J.). But the Court believes that *Redding* is distinguishable for at least two reasons. First, in *Redding* the respondent specifically moved to dismiss or transfer the petition based on the district court's purported lack of jurisdiction following the petitioner's transfer. *See id.* at *2–3. Respondent here has not done this, notwithstanding the notice of the transfer provided by the August 2018 Letter. Respondent has thus arguably forfeited the jurisdictional argument pressed in *Redding*.

Second, the Court observes that in *Redding*, when the relevant transfer occurred, briefing of the § 2241 petition was incomplete: the petition had been filed, but the respondent had yet to give a substantive response. *See* Docket, *Redding v. Thompson*, No. 17-CV-2740 (JRT/TNL) (showing that petition was filed on March 29, 2017, and that respondent had made no substantive response before transfer of action to Central

8

District of Illinois in January 2018). In contrast, here it appears that Respondent did substantively respond to the Petition before Vaughn's transfer.[5] That this Court did not reach and address the § 2241 petition before Vaughn was transferred was entirely outside Vaughn's control. As a result, the equities here lend themselves to a finding that this Court, notwithstanding Vaughn's transfer, still has jurisdiction over the Petition.[6]

### 2. Jurisdiction Over BOP decisions

Respondent's jurisdictional argument hinges on certain statutes that exempt many BOP decisions from judicial review. Under the Administrative Procedure Act (APA), "[a] person suffering legal wrong because of agency action, or adversely affected by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. As Respondent points out, however, the APA shields agency action from judicial review when "(1) statutes preclude judicial review; or . . . (2) agency action is committed to agency discretion by law." *Id.* § 701(a); *see also* (Resp. at 7 (quoting § 701(a)).)

Title 18 of the U.S. Code governs "crimes and criminal procedure"; chapter 229 of Title 18 concerns the administration of criminal sentences, with subchapter C handling imprisonment. Under 18 U.S.C. § 3625—titled "Inapplicability of the Administrative Procedures Act"—the judicial-review provision of 5 U.S.C. § 702 does not apply to "the

---

[5] Vaughn did not file a reply to Respondent's answer, but no reply was required. *See* (May 2018 Order at 2 ("*If Vaughn intends to file a reply to Respondent's answer*, he must do so within thirty days of the date when the answer is filed." (emphasis added)).)

[6] The Court notes here the U.S. Supreme Court's admonition that "habeas corpus is, at its core, an equitable remedy." *Schlup v. Delo*, 513 U.S. 298, 319 (1995); *cf. Boumediene v. Bush*, 553 U.S. 723, 780 (2008) (citing *Schlup*).

9

making of any determination, decision, or order under [subchapter C]." Subchapter C covers 18 U.S.C. § 3621–26, including the RDAP-related provisions of § 3621(e). Numerous cases from this district state that decisions about RDAP expulsions generally fall within § 3625's ban on judicial review. *See, e.g.*, *Lipczynski v. Marques*, No. 18-CV-1466 (JNE/BRT), 2018 WL 4956717, at *5 (D. Minn. Sept. 6, 2018) (Thorson, Mag. J.), *report and recommendation adopted*, 2018 WL 4955236 (Oct. 12, 2018) (Ericksen, J.); *Berry v. Marques*, No. 18-CV-0934 (SRN/TNL), 2018 WL 3750543, at *3 (D. Minn. July 18, 2018) (Leung, Mag. J.), *report and recommendation adopted*, 2018 WL 3748179 (Aug. 7, 2018) (Nelson, J.).

But what Respondent's memorandum inexplicably fails to mention is that this general rule is subject to certain exceptions, and one of those exceptions applies here. In particular, courts may review BOP decisions made under §§ 3621–26 when the inmate asserts that "'the BOP's action is contrary to established federal law, *violates the Constitution*, or exceeds statutory authority.'" *Berry*, 2018 WL 3750543, at *4 (quoting *Ambrose v. Jett*, No. 13-CV-2343 (PJS/JSM), 2013 WL 6058989, at *7 (D. Minn. Nov. 15, 2013) (Mayeron, Mag. J. as adopted by Schiltz, J.) (emphasis added)); *see also Reeb v. Thomas*, 636 F.3d 1224, 1227 (9th Cir. 2001) (citing the same exceptions in an RDAP-expulsion case).

Here, Vaughn's challenge to his expulsion is plainly based on the U.S. Constitution: he claims the expulsion violated constitutional equal-protection guarantees. *See* (Pet. at 7–8; Mem. at 1–3.) The Court thus concludes that it has jurisdiction to review the Petition and will review the Petition on the merits.

10

**B.     Merits**

Vaughn presents his claim as one seeking enforcement of his constitutional right to equal protection. *See, e.g.*, (Mem. at 1–5.) Raising this claim against federal officials (because he has been in federal prison), the source of the relevant right is the implicit equal-protection component of the Fifth Amendment's due-process clause. *See, e.g.*, *Bolling v. Sharpe*, 347 U.S. 497, 498–99 (1954); *New Doe Child #1 v. United States*, 901 F.3d 1015, 1027 (8th Cir. 2018) (citing *Bolling*). Courts analyze Fifth Amendment equal-protection claims under the same principles applied to Fourteenth Amendment equal-protection claims. *See, e.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995); *see also Coal. For Fair & Equitable Regulation of Docks on Lake of the Ozarks v. F.E.R.C.*, 297 F.3d 771, 779 (8th Cir. 2002) (citing *United States v. McClinton*, 815 F.2d 1242, 1244 n.3 (8th Cir. 1987)).

The equal-protection guarantee of the Fifth and Fourteenth Amendments "generally requires the government to treat similarly situated people alike." *Klinger v. Dep't of Corrs.*, 31 F.3d 727, 731 (8th Cir. 1994) (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)). The first step in an equal-protection case is to determine whether the claimant has shown different treatment than others similarly situated. *Id.* (citing *Samaad v. City of Dallas*, 940 F.2d 925, 940–41 (5th Cir. 1991)); *see also In re Kemp*, 894 F.3d 900, 909 (8th Cir. 2018) (quoting *Klinger*, 31 F.3d at 731); *cf. Correll v. United States*, No. 14-CV-4158, 2015 WL 1478024, at *4 (D.S.D. Mar. 31, 2015) (applying *Klinger* to a § 2241 petition pressing an equal-protection challenge to RDAP enrollment), *aff'd*, 626 F. App'x 662 (8th Cir. 2015). Among various arguments,

11

Respondent argues that Vaughn has not shown that he has been treated differently than similarly situated inmates. *See* (Resp. 13–14.[7]) The Court agrees.

Vaughn points to three specific RDAP participants to show that he was treated differently than similarly situated others. *See* (Mem. at 3–4.[8]) First, he alleges that a white inmate named Rather "was disciplined for a 200/300 level infraction related to phone abuse," but was not expelled from RDAP. (*Id.* at 3.) Second, he states that a white inmate named Weaver "was caught for [having] gambling paraphernalia and was not expelled." (*Id.*) Third, he claims that an inmate "of Puerto Rican descent," named Rosado, "received numerous disciplinary infractions and was not expelled [from RDAP] despite their more serious 200/300 level nature." (*Id.*)

For two reasons, the Court finds that these other RDAP participants are not "similarly situated" to Vaughn. First, even assuming that Vaughn's allegations about the

---

[7] Respondent also argues, *inter alia*, that (1) the BOP acted properly in expelling Vaughn from RDAP, and (2) Vaughn has no constitutional or statutory right to participate in RDAP or to secure an RDAP-related early release. *See* (Resp. 10–13.) Because the Court finds that Vaughn's equal-protection argument fails, it need not address these points.

[8] In addition to invoking these three specific people, Vaughn makes numerous more vague allegations about alleged racial discrimination in RDAP decisions. *See, e.g.*, (Pet. 7–8, Mem. 3–4.) Such conclusory allegations are not enough to ground an equal-protection claim, for they cannot establish how Vaughn was being treated differently than others who are similarly situated in all relevant respects. *See, e.g.*, *Stevens v. Roy*, No. 16-CV-3807 (JRT/LIB), 2017 WL 8944013, at *17 (D. Minn. June 8, 2017), *report and recommendation adopted*, 2017 WL 4156999 (D. Minn. Sept. 19, 2017); *Lovejoy v. Minn. Dep't of Human Servs.*, No. 16-CV-2468 (JRT/LIB), 2017 WL 462015, at *7 (D. Minn. Jan. 3, 2017) (Brisbois, Mag. J.), *report and recommendation adopted*, 2017 WL 455933 (Feb. 2, 2017) (Tunheim, C.J.). Vaughn's equal-protection claim thus rises and falls with his allegations about the three specific inmates.

12

other inmates are true,[9] his code violation differed from those of the other RDAP participants. Vaughn was disciplined for engaging in sexual conduct in a prison visiting room; there is no allegation that Rather, Weaver, or Rosado engaged in similar conduct.[10]

Vaughn stresses that these other inmates' conduct was more problematic than his, as measured by the conduct's infraction levels. *See* (*id.* at 3–4.) The idea here is presumably that Vaughn unfairly received harsher punishment for less-severe conduct. As a preliminary point, Vaughn's claim about his conduct's infraction level is arguably false: the record suggests that Vaughn could have been found guilty of a 200-level infraction, but officials elected instead to give him a 400-level infraction. Even if Vaughn merely committed a 400-level infraction, though, decisions about what conduct is problematic for RDAP participants need not correspond neatly to the BOP's infraction levels. For instance, "[m]isuse of authorized medication" is a 300-level infraction, while (to take one example) "[d]emonstrating, practicing, or using martial arts, boxing, [or] wrestling" is a 200-level infraction. 28 C.F.R. § 541.3. In many contexts, the 200-level violation may be more problematic than the 300-level violation. For RDAP-relevant

---

[9] Marques suggests that at least one of the three inmates Vaughn relies upon had no disciplinary record at all. *See* (Resp. at 14; Becker Decl. ¶ 13.)

[10] Marques's discussion of the other inmates is confusing. Vaughn refers to three named inmates, but Marques responds by discussing people identified by three initials: P, W, and R. *See* (Resp. at 14; Becker Decl. ¶ 13.) Inmate W appears to correspond to Weaver, given the relevant initial and the type of conduct involved. *Compare* (Becker Decl. ¶ 13 (discussing W's involvement with gambling violations), *with* Mem. at 3 (stating that Weaver was "caught for gambling paraphernalia").) But the Court cannot tell how P and R correspond to the inmates that Vaughn names as Rather and Rosado. For the reasons discussed below, however, the Court concludes that it can nevertheless determine that Vaughn is not similarly situated with the other inmates.

13

decisions, however, misusing medications could be far more worrying. So even if one goes beyond the fact that Vaughn and the other relevant inmates committed different offenses, Vaughn's comparison attempt misfires.

Second, Marques claims—and Vaughn has not disputed—that two of the relevant inmates had a different Drug Abuse Program Coordinator ("DAPC"). *See* (Resp. at 14; Becker Decl. ¶ 13.) Having a different DPAC does indeed make different inmates dissimilarly situated. In cases trying to determine whether relevant individuals are similarly situated, courts in the Eighth Circuit (and the Eighth Circuit itself) have determined that where the relevant decisionmaker is different, different individuals are not similarly situated. *See, e.g.*, *Huynh v. U.S. Dep't of Transp.*, 794 F.3d 952, 960 (8th Cir. 2015) (finding individuals not similarly situated where immediate supervisors differed); *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008) (finding individuals not similarly situated where they had different supervisors); *Johnson v. Univ. of Iowa*, 431 F.3d 325, 330 (8th Cir. 2005) (finding individuals not similarly situated where, among other things, they "reported to different supervisors"); *Paul v. Metro. Council*, No. 10-CV-4759 (JRT/FLN), 2012 WL 3734147, at *5 n.7 (D. Minn. Aug. 28, 2012) (Tunheim, J.) (granting summary judgment and finding that individuals were not similarly situated where, among other things, they had different supervisors). As a result, Vaughn is not similar situated to these inmates.[11]

---

[11] Some of these cases address the standards applied in race-discrimination cases brought under Title VII of the Civil Rights Act. But the Eighth Circuit has clarified that the analytical standards for an equal-protection claim are the same as those for a Title VII claim. *See Tipler v. Douglas Cty.*, 482 F.3d 1023, 1027 (8th Cir. 2007); *see also Rivkin*

14

In summary, Vaughn has not shown that he has been treated differently than others who are similarly situated. As a result, his equal-protection claim fails. The Court thus recommends denying the Petition and dismissing this action with prejudice.

## III. RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, it is hereby recommended that Petitioner Melvin Vaughn's Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241, Doc. No. 1, be **DENIED**, and that this action be **DISMISSED with prejudice**.

Dated:  May 15, 2019                                  s/ *Hildy Bowbeer*
                                                      Hildy Bowbeer
                                                      United States Magistrate Judge

### NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).

---

*v. Hennepin Cty.*, No. 01-CV-0670 (PAM/RLE), 2002 WL 31777800, at *4 (D. Minn. Dec. 12, 2002) (Magnuson, J.).